IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


YOLANDA BIRMINGHAM                                        PLAINTIFFS


VS.                          CASE NO. 06-CV-4019


AIG LIFE INSURANCE COMPANY
and THE DOW CHEMICAL COMPANY                              DEFENDANTS

## AMENDED MEMORANDUM OPINION

Plaintiff Yolanda Birmingham filed this complaint against Defendants AIG Life Insurance

Company ("AIG") and The Dow Chemical Company ("Dow") pursuant to the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that her permanent total

disability benefits were wrongfully denied. The parties have filed briefs on the Administrative

Record. The Court issued an Order dismissing Plaintiff's claims with prejudice. (Doc. 34). Plaintiff

filed a Motion for Reconsideration Incorporating a Motion for an Evidentiary Hearing and Motion

for Discovery and Objections to the Court's Orders. (Doc. 35). Defendants responded. (Doc. 37).

The Court granted Plaintiff's Motion for Reconsideration in part (Doc. 39) and now amends its

Memorandum Opinion dated February 11, 2009. (Doc. 33).


BACKGROUND

Plaintiff brings this case before the Court to seek review of the denial of her claim and

appeal for permanent total disability ("PTD") benefits under the terms of The Dow Chemical

Voluntary Group Accident Insurance Plan ("Accident Plan"). Plaintiff began working for Dow on

May 9, 1986, and worked there continuously until August 2003. It is undisputed that she was a

covered member under the Accident Plan and that the Accident Plan is governed by ERISA, 29

U.S.C. § 1001 *et seq.* AIG insures the Accident Plan and as the claim administrator has sole

discretion to grant or to deny claims made under the Accident Plan. (Dow is the plan administrator,

but AIG retained responsibility for investigating and deciding claims and was given full discretion

to do so in the Accident Plan language.) Plaintiff also does not dispute that the Accident Plan gives

AIG full and complete discretion as claim administrator. Plaintiff has not worked at Dow or in any

other employment since August 23, 2003.

I. The Accident Plan

The Accident Plan gives AIG full and complete discretion to review claims as the claim

administrator. The pertinent language reads as follows:

> "For purposes of making Claims for Plan Benefits determinations, the Claims Administrator
> has the full and complete discretion to interpret and construe the provisions of the Plan, and
> such interpretation shall be final, conclusive and binding...the Claims Administrator also has
> the full and complete discretion to make findings of fact and to apply those findings of fact
> to the provisions of the Plan."

The Accident Plan also explains what is required to receive PTD benefits and also gives a definition

of PTD. The pertinent language reads as follows:

> "When as the result of injury and commencing within 365 days of the date of the accident
> an insured person is totally and permanently disabled and prevented from engaging in each
> and every occupation or employment for compensation or profit for which he is reasonably
> qualified by reason of his education, training or experience, the Company will pay, provided
> such disability has continued for a period of twelve consecutive months and is total,
> continuous and permanent at the end of this period, the Principle Sum."

> "Under this Plan, you are considered to be totally and permanently disabled when you are not
> able to engage in any occupation or employment for pay or profit for which you are
> reasonably qualified based on your education, training or experience. The permanent and
> total disability must begin within 365 days of the date of the accident and must continue for
> twelve consecutive months before a permanent total disability benefit is payable."

Lastly, the Accident Plan provides procedures that AIG must follow in processing appeals of denied

2

claims. The pertinent language reads as follows:

> "You may submit any additional information to AIG when you submit your request for appeal...The reviewer will take into account all comments, documents, records, etc., submitted to AIG that is related to the Claim whether or not this information was submitted or considered in the initial determination."

> "The person who will review your appeal will not be the same person who made the initial decision to deny the Claim. In addition, the person who is reviewing the appeal will not be a subordinate who reports to the person who made the initial decision to deny the Claim."

II. Plaintiff's Medical History[1]

In November 2002, Plaintiff began wearing dentures and using Poligrip to hold her dentures in place. On July 8, 2003, Plaintiff hurt her back at work while throwing out the trash. She did not report this incident to anyone at Dow because she thought she had merely pulled a muscle. Plaintiff took some Aleve and continued to work.

On August 11, 2003, Plaintiff saw Dr. Charles Fuselier, a podiatrist. She complained of numbness and pain in her right foot. Dr. Fuselier diagnosed Plaintiff with Morton's neuromas. Dr. Fuselier sent Plaintiff to St. Michael Hospital for lab work, including heavy metal screening. The heavy metal screening was performed on August 14, 2003 and indicated that Plaintiff had the following levels of zinc: 1)  (ug/dl) 208.5 H with a reference range of 10.0 - 80.0; and 2) (ug/Day) 3962 H with a reference range of 150 - 1200. Plaintiff returned to Dr. Fuselier's office on August 22, 2003, and he discussed the excessive zinc in her urine. He told her to drink plenty of water to flush the zinc out of her system and inquired into possible sources of the zinc exposure. Plaintiff complained of nausea and extremity pain. Dr. Fuselier instructed Plaintiff to stay off work but advised her that Dow may not be the source of the zinc exposure.

---

[1] This section is a summary of what the Court finds to be the relevant facts from Plaintiff's medical records.

On August 23, 2003, Plaintiff went to the emergency room because she could not walk very well, was intensely nauseated, and had an intense headache.  Plaintiff was admitted to the emergency room at Christus St. Michael Hospital with a chief complaint of possible zinc poisoning. She was treated by Dr. Patrick Weber at the emergency room and his clinical impression was heavy metal toxicity (zinc). Dr. Weber instructed Plaintiff to collect her urine for 24 hours. Dr. Weber then ordered labs, with heavy metal screening, on this collection. On August 24, 2003, the lab results showed Plaintiff had the following Zinc levels:  1)  (ug/dl) 162.9 H with a reference range of 10.0 - 80.0; and 2) (ug/Day) 3625 H with a reference rang of 150 - 1200. Dr. Weber referred Plaintiff to Dr. Dean Bowman at Area Health Education Center.

On August 25, 2003, Plaintiff saw Dr. Bowman for the first time. Dr. Bowman noted Plaintiff's labs indicated high levels of zinc. Dr. Bowman also noted Plaintiff had slurred speech, left eye droop, muscle cramps, and excessive fatigue. Dr. Bowman's assessment was zinc toxicity and fatigue. Dr. Bowman advised Plaintiff to stay off work and scheduled her to return to see him in two weeks.

Over the next several months, Plaintiff continued to see Dr. Bowman and receive similar assessments. He did add to his assessments, throughout this time period, the symptoms of pain in joints, drooping eyelid, insomnia, difficulty swallowing, voice disorder, and back pain. On September 23, 2003, Plaintiff saw Dr. Jeff Phillips, an opthamologist, who recommended she be tested for myasthenia gravis. Dr. Bowman referred Plaintiff to Dr. Malik, a neurologist, in November 2003. It was around this time that Dr. Bowman began assessing Plaintiff as possibly having myasthenia gravis. On November 25, 2003, Dr. Bowman noted that Plaintiff needed an appointment with a toxicologist if there was no resolution of her zinc levels. Plaintiff had lab tests on December

22, 2003, which indicated her zinc levels as follows: 1) (ug/dl) 65.3 H with a reference range of 10.0 - 80.0; and 2) (ug/Day) 2204 H with a reference rang of 150 - 1200. Dr. Bowman continued to note zinc poisoning or zinc toxicity on his assessments at each of Plaintiff's visits until March 2004 but never referred her to a toxicologist. On March 29, 2004, Dr. Bowman stopped noting any zinc related diagnosis on Plaintiff's medical records, and he did not test her zinc levels again after December 2003.[2]

Plaintiff first saw Dr. Malik, a neurologist, on November 19, 2003. He noted she suffered from headaches, facial droop, vertigo, history of elevated zinc, speech problems, and numbness in left hand and right foot. On January 1, 2004, Dr. Malik diagnosed Plaintiff with myasthenia gravis. Dr. Malik then ordered an EMG nerve conduction study which was done on March 23, 2004. This test showed myasthenia gravis, carpal tunnel syndrome, and L5-S1 radiculopathy.

Plaintiff began physical therapy in March 2003. During her evaluation she mentioned she was suffering from heavy metal toxicity and myasthenia gravis. She continued physical therapy with little results for about one month. On March 29, 2004, Dr. Bowman noted in his assessment of Plaintiff that she suffered from right chronic effusion, lower back pain, and right leg paresthesis. Plaintiff had an MRI of her lumbar spine on April 2, 2004. The impressions from the MRI were reviewed by Dr. Freddie Contreras, a neurosurgeon. On June 29, 2004, Dr. Contreras  scheduled a lumbar myelogram. Dr. Contreras concluded that Plaintiff probably had disk herniation at L5-S1. Plaintiff was not interested in surgery, so in August 2004 she underwent a series of three steroid shots to relieve the pain in her back. These are the last medical records available in the Administrative

_____

[2] Dr. Bowman did, however, list zinc toxicity as one of many conditions suffered by Plaintiff on a physician questionnaire he filed out at the request of AIG on October 15, 2004.

5

Record.

III. Claim History

Plaintiff first applied for PTD benefits under the Accident Plan in April 2004. AIG informed

Plaintiff that she must wait until she had been disabled for twelve months before she could apply for

PTD benefits. Plaintiff then re-applied for PTD benefits in September 2004. On the Proof of Loss

Form Plaintiff submitted with her September 2004 claim, Dr. Bowman, as her attending physician,

noted her diagnosis as myasthenia gravis and lumbar back pain. In the symptoms section Dr.

Bowman noted Myasthenia gravis with resultant weakness, fatigue, speech difficulties, and low back

pain with radiculopathy in her right leg. Plaintiff also submitted a statement she wrote on September

1, 2004, describing the accident she suffered. The statement reads:

> "While disposing of trash on July 8, 2003, I [bent] down and picked up the shop bag; as I
> [straightened] up and turned to put the bag in the dumpster, I felt a sharp pain in my lower
> back that ran down my right leg. I went to the doctor two days later, July 11, 2003. I have
> been diagnosed with [m]yasthenia [g]ravis, [l]umbar back pain, spinal stenosis, pinched
> nerve and heavy metal toxicity to [z]inc...I have disabling conditions of spinal stenosis,
> pinched nerve, Myasthenia gravis and heavy metal toxicity to zinc. I have not worked since
> August 23, 2003."

AIG investigated Plaintiff's claim by hiring International Claim Specialists ("ICS") to gather

information and Genex Services, Inc., to evaluate Plaintiff's medical records. An ICS investigator

traveled to Plaintiff's home and interviewed her. All of Plaintiff's medical records regarding her

back injury were gathered and sent to a spine specialist, Dr. Allan Fielding. Dr. Fielding issued an

independent medical review based on Plaintiff's medical records. In his report, Dr. Fielding

concluded that there was no objective evidence indicating Plaintiff suffered a low back injury, and

Plaintiff had no disability relating to her lower back that would prevent her from working. Dr.

Fielding's report was then sent to each of Plaintiff's treating physicians and they were asked to

6

comment on whether or not they agreed with Dr. Fielding. Dr. Bowman stated that it was his opinion that Plaintiff does have some degree of disability related to her back, but likely not so significant as to cause PTD. Dr. Contreras advised that he agrees with Dr. Fielding's opinion that Plaintiff's initial back injury on July 8, 2003 is not the cause of her long term disability. Lastly, Dr. Malik had no opinion on Plaintiff's case. AIG denied Plaintiff's claim for PTD benefits by letter dated May 17, 2005. In this denial letter, AIG set out all of the documents and facts it considered in its denial. AIG also explained the reasons for its denial. AIG based its denial on Dr. Fielding's report along with the responses to Dr. Fielding's report from Plaintiff's treating physicians.

Plaintiff then filed an appeal with AIG, pursuant to the Accident Plan, on June 7, 2005. The basis of Plaintiff's appeal was that her initial claim for PTD was based on zinc poisoning caused by Poligrip denture adhesive ("Poligrip"), not a back injury, and AIG failed to consider Plaintiff's zinc poisoning in denying her claim. On June 8, 2005, AIG requested Plaintiff to provide proof of her assertion that she suffered from zinc poisoning. Plaintiff responded by sending her lab results performed on August 14, 2003, which indicate elevated zinc levels, and she also referred AIG to the medical records from Dr. Bowman which were already in AIG's possession. Plaintiff also provided AIG with Dr. Rod O'Connor's report which speaks to his theory on the relationship between Poligrip and zinc poisoning.[3]

On July 23, 2005, AIG requested further information regarding when Plaintiff received dentures, proof of when she began using Poligrip, and any records of any physician that diagnosed Plaintiff with zinc poisoning caused by Poligrip. Plaintiff responded, on September 28, 2005, with her dental records showing that she had her teeth surgically removed on November 15, 2002 and

---

[3] Dr. O'Connor is an environmental chemical consultant.

7

began wearing dentures at that time. Plaintiff also stated that she began using Poligrip immediately after receiving her dentures in November 2002, and provided AIG with a reviewing physician report written by Dr. Marable in which he concluded that Poligrip caused Plaintiff's zinc poisoning.[4]

On January 21, 2006, AIG referred Plaintiff's appeal to Kevin Cook, an attorney, for legal review. Mr. Cook located and retained Dr. Gary Wimbish, Ph.D., a forensic toxicologist, to review Plaintiff's medical records regarding her zinc poisoning.  Dr. Wimbish, after reviewing Plaintiff's medical records, concluded that in his opinion it is within all reasonable scientific probability that Plaintiff's exposure to zinc did not result in any of the signs and symptoms reported by her treating physicians and that zinc toxicity had not occurred. On January 26, 2006, Plaintiff informed AIG that she was filing suit because AIG had exceeded the time limit allowed by ERISA for a response regarding her appeal. On February 27, 2006, Mr. Cook prepared a legal review of Plaintiff's original claim and appeal. He advised that in his legal opinion he did not think that Plaintiff's use of Poligrip constitutes an accident under the Accident Plan.[5]  Plaintiff's appeal went before the ERISA Appeals Committee for consideration on April 25, 2006. AIG sent Plaintiff a letter dated May 1, 2006, denying her appeal. The denial letter summarized the facts and records reviewed by the ERISA Appeals Committee and explained that the Committee relied on Dr. Wimbish's report in determining that Plaintiff did not incur an injury as the result of an accident which produced a PTD within 365 days of such accident as required by the Accident Plan.

_____

[4] Dr. Marable is a board certified neurologist. In forming his opinion regarding Plaintiff, he examined Plaintiff, reviewed her medical records, and reviewed Dr. Rod O'Connor's report. Dr. Marable also excluded other possible sources of Plaintiff's zinc poisoning, i.e. drinking water and Dow Chemical.

[5] The Court notes that AIG makes no mention of this legal report, or whether the zinc poisoning was an accident in their denial letter.

STANDARD OF REVIEW

The Court has previously determined the correct standard of review to be applied in this case by an Order dated October 13, 2006. (Doc. 30). However, the Court erred in applying the sliding scale approach of *Woo v. Delux Corp.,* 144 F.3d 1157, 1160 (8th Cir. 1998) in its Memorandum Opinion (Doc. 33) as this approach is no longer appropriate. *Hackett v. Standard Insurance Company,* 2009 WL 703235 at *5 (8th Cir. March 19, 2009). Instead, the Court will apply a "combination-of-factors method" applied by the Supreme Court in *Metropolitan Life Insurance Co. v. Glenn.* __ U.S.__, 128 S.Ct. 2343 (2008). Generally, when a disability plan governed by ERISA gives the plan administrator discretionary authority to determine eligibility for benefits, the Court reviews the administrator's decision for abuse of discretion. *Firestone Tire & Rubber Co. v. Branch,* 489 U.S. 101, 115, 109 S.Ct. 984, 103 L.Ed. 2d 80 (1989).[6] The Court would only reverse the plan administrator's decision if it is arbitrary and capricious. *Groves v. Metropolitan Life Ins. Co.,* 438 F.3d 872, 874 (8th Cir. 2006). The Eighth Circuit has stated that "[w]hen a plan administrator offers a reasonable explanation for its decision, supported by substantial evidence, it should not be disturbed." *Ratliff v. Jefferson Pilot Fin. Ins. Co.,* 489 F.3d 343, 348 (8th Cir. 2007). Substantial evidence is defined as "more than a scintilla but less than a preponderance." *Schatz v. Mutual of Omaha Ins. Co.,* 220 F.3d 944, 949 (8th Cir. 2000). The Eighth Circuit has also stated that "[t]he discretionary decision of a plan administrator is not unreasonable merely because a different, reasonable interpretation could have been made." *Ratliff,* 489 F.3d at 348. The Court may consider the quantity and quality of evidence before a plan administrator and the Court should be hesitant to

_____

[6] It is undisputed that the Accident Plan provides discretionary authority to the claim administrator—AIG.

9

interfere with the administration of an ERISA plan. *Groves,* 438 F.3d at 875.

The dual role of being the administrator and insurer of ERISA benefits creates a conflict of interest. *Glenn,* 128 S.Ct. at 2346. A reviewing court should consider this conflict as one factor among many in determining whether the plan administrator abused its discretion by denying benefits. *Id.* (citing *Fireston,* 489 U.S. at 115). The significance of the conflict of interest will depend on the circumstances of the particular case. *Id.* (citing *Firestone,* 489 U.S. at 115).   The *Glenn* Court also stated that the *Firestone* Court did not imply a change in the standard of review from deferential to *de novo* and the *Glenn* Court would not overturn *Firestone* by adopting a rule that in practice would result in a near universal *de novo* review of ERISA plan claim denials. *Id.* at 2350. The *Glenn* Court was clear that it was not changing the abuse of discretion standard of review, but instead only weighing the conflict of interest as a factor in determining whether there was an abuse of discretion. *Hackett*, 2009 WL 703235 at *5. In the "combination-of-factors method," the conflict of interest serves as a "tie breaker when the other factors are closely balanced." *Id.* (quoting *Glenn,* 128 S.Ct. at 2351). The conflict of interest factor is "more important ... where circumstances suggest a higher likelihood that it affected the benefits decision" and "less important ... where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.* (quoting *Glenn*, 128 S.Ct. at 2351).

<u>DISCUSSION</u>

The issue before the Court is whether AIG abused its discretion when it denied Plaintiff's appeal based on its determination that she was not permanently and totally disabled as the result of an injury which commenced within 365 days of an accident as required by the Accident Plan. The Court notes that because AIG determined that Plaintiff was not permanently and totally disabled as

a result of zinc toxicity, they did not reach the issues of whether Plaintiff's zinc toxicity was an accident and whether the use of Polgrip caused her zinc toxicity. In addition, the Plaintiff does not challenge the denial of her original claim based on her back injury. Therefore, the Court will not address these issues.

I. Procedural Irregularities

The Court first addresses the fact that AIG did not consider Plaintiff's zinc toxicity as the cause of her PTD in her initial claim and instead only considered her back injury suffered at work on July 8, 2003. The Court finds that it is clear from the Administrative Record that Plaintiff's initial claim was one for a back injury. The Court recognizes that zinc toxicity is listed in Plaintiff's statement made in the initial claim as one of many diagnoses suffered by Plaintiff, but zinc toxicity is not listed in the diagnosis box of Plaintiff's Proof of Loss Form submitted with her original claim. It is also remarkable to the Court that when AIG asked Plaintiff what caused the injury for which she is claiming PTD, Plaintiff responded with a description of injuring her back while throwing out a trash bag at work on July 8, 2003. For these reasons, the Court finds it perfectly reasonable that AIG only considered Plaintiff's back injury in the initial claim.

Second, the Court finds that AIG's letter denying Plaintiff's appeal satisfies the notification requirements of the ERISA statute. If an applicant's benefits under an ERISA plan have been denied, she must be provided with notice setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant. 29 U.S.C. § 1133. AIG's denial letter concluded that the record contains substantial evidence that Ms. Birmingham did not incur an injury as a result of an accident which produced a disability within 365 days of such accident. The Court finds that AIG based its denial on the fact that Plaintiff's situation did not meet the requirements of

the plain language of the Accident Plan, and that is a reasonable basis for denial. The Court also notes that AIG set out in its denial letter the language of the Accident Plan and that Plaintiff's claim of zinc toxicity did not constitute a PTD. The denial letter included a summary of Plaintiff's medical records, and, in the Court's opinion, the summary was sufficient. The denial letter also included reference to both Dr. Marable and Dr. O'Connor's reports, as well as a summary of Dr. Wimbish's report. Therefore, the Court finds that AIG's denial letter satisfied ERISA notification requirements as set out in 29 U.S.C. section 1133.

Plaintiff also points out procedural irregularities that took place in the processing of her claim. First, AIG did not follow the procedure for appeals set out in the Accident Plan when they allowed the same person to process Plaintiff's initial claim and appeal. Second, AIG failed to render a decision on her appeal within 45 days. Third, AIG did not obtain an independent medical evaluation of Plaintiff. Plaintiff argues that all three of these constitute serious procedural irregularities that prove that AIG's denial of her claim was made on a whim and thus was an abuse of discretion by AIG. *Buttram v. Cent. States, Southeast and Southwest Areas Health & Welfare Fund,* 76 F.3d 896, 900 (8th Cir. 1996). In AIG's Brief it does not offer the Court an explanation why the same claim specialist reviewed Plaintiff's intitial claim and appeal. AIG admits that it issued its denial of Plaintiff's claim well over 45 day after she filed it. However, AIG asserts that this was a consequence of the fact that Plaintiff changed her claim on appeal from one for a back injury to one for zinc toxicity. AIG also admits that it did not obtain an independent medical evaluation of Plaintiff. However, AIG asserts that its action of having Dr. Wimbish, a forensic toxicologist, review Plaintiff's medical records and render his opinion regarding Plaintiff's medical condition proves that AIG's decision to deny Plaintiff's claim was not a whim but instead an informed

judgment.

In *Buttram*, the Eighth Circuit held that a complete failure to inform claimant that his appeal had been denied was not a procedural irregularity that constituted a heightened standard of review. Additionally, the *Buttram* court explained that the mere existence of procedural irregularities does not constitute the application of a heightened standard of review. 76 F.3d at 901.[7] Instead, there must be evidence that the denial was reached without "reflection and judgment." *Id.* The Court does not believe that the record contains evidence showing that AIG's failure to complete the appeal within 45 days or its failure to obtain an independent medical evaluation resulted in AIG denying Plaintiff's appeal without reflection and judgment. The Court finds AIG's explanation for the delay in rendering a decision on Plaintiff's appeal was reasonable. In addition, while AIG did not have Plaintiff physically examined, it did have a qualified doctor review all her medical records and issue a report regarding his opinion of her medical condition. Therefore, while the Court will consider all three of the procedural irregularities raised by Plaintiff as factors in its consideration, AIG's failure to rule on Plaintiff's appeal within 45 days and AIG's failure to obtain an IME do not show the Court that AIG rendered its denial without reflection and judgment. However, because the Court can find no explanation as to why the same claim specialist reviewed both Plaintiff's initial claim and appeal this procedural irregularity will be considered as a negative factor.

## II. Abuse of Discretion

Plaintiff first argues that AIG abused its discretion by not repeating each of the investigation

_____

[7] While the Court recognizes that *Buttram* was decided before *Glenn* settled the question of the approriate standard of review for these types of case, it is still instructive as to how the Court should consider procedural irregularities in the combination-of-factors method.

techniques in reviewing Plaintiff's appeal as it used in Plaintiff's initial complaint.[8] The Accident Plan allows for Plaintiff to submit any additional information to AIG when she submits her appeal, and she did just that. Plaintiff submitted her dental records and two reviewing physician reports during the course of her appeal. The Accident Plan also requires that AIG take into consideration everything submitted that is related to the claim, whether or not this information was submitted or considered in the initial determination. It is evident from the Administrative Record that AIG complied with this requirement by requesting and reviewing Plaintiff's dental records, as well as sending all of Plaintiff's medical records, and submitted reviewing physician reports to Dr. Wimbish, a toxicologist, for review.[9]

The Court finds that AIG gathered all of Plaintiff's medical records and interviewed Plaintiff regarding her health issues during the processing of Plaintiff's original claim. Plaintiff's medical records relating to her zinc toxicity were included in the medical records collected during the original claim process. Plaintiff also spoke of her "heavy metal poisoning" during her interview regarding her first claim. Plaintiff has not offered the Court any additional medical records that would have been material to her appeal and discovered by a re-gathering of medical records and a re-interview of Plaintiff. Lastly, AIG requested from Plaintiff any medical records containing a diagnosis of zinc poisoning as a result of her use of Poligrip, and Plaintiff responded with Dr. O'Connor's report which was sent to Dr. Wimbish along with all of the other documents for review. Therefore, the Court finds that AIG did not abuse its discretion by not hiring an investigation company to re-gather

---

[8] Plaintiff contends AIG should have hired a company to gather medical records and traveled to Plaintiff's home to interview her again.

[9] The Accident Plan also required AIG to consult a health care professional, who was not the health care professional consulted on the original claim, to review Plaintiff's appeal.

Plaintiff's medical records, or by not sending someone to Plaintiff's home to re-interview her regarding her health condition.

AIG also did not abuse its discretion by not sending the report of the reviewing toxicologist, Dr. Wimbish, to Plaintiff's treating physicians for their review and comment. Even if AIG would have sent Dr. Wimbish's report to Plaintiff's treating physicians for review and comment, AIG would not have been required to rely on Plaintiff's treating physician's opinions rather than Dr. Wimbish's opinion. *McGee v. Reliance Standard Life Ins. Co.,* 360 F.3d 921, 925 (8th Cir. 2004) (citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 830, 123 S.Ct. 1965, 155 L.Ed.2d 1043 (2003) (holding that an administrator is not obligated to accord special deference to the opinions of the treating physician over the conflicting opinion of the reviewing physician)). Therefore, the Court holds that AIG did not abuse its discretion through its investigation techniques.

The Plaintiff also argues that it was an abuse of discretion for AIG to rely on Dr. Wimbish's report. The Eighth Circuit has recently explained that a plan administrator is entitled to obtain a professional peer review opinion, but it is "not free to accept this report without considering whether its conclusions follow logically from the underlying medical evidence." *Willcox v. Liberty Life Assurance Co. of Boston,* 552 F.3d 693, 700-701 (8th Cir. 2009) (citing *Abram v. Cargill, Inc.,* 395 F.3d 882, 887 (8th Cir. 2005)). In *Willcox*, the court held it was an abuse of discretion for the plan administrator to rely on a "demonstrably incorrect conclusion" from a reviewing physician. *Id.* at 701. The reviewing physician in *Willcox* stated that there was no objective evidence in the record to support the plaintiff's disability claim. *Id.* However, the court noted that there were multiple documentations made of symptoms relating to plaintiff's claimed disability. *Id.* Also, there were inaccuracies in the reviewing physician's report indicating that he either did not read all of the

medical records or that he only reviewed them cursorily. *Id.* The *Wilcox* court found the reviewing physician's report to be "incomplete and [a] selective picture of the medical evidence." *Id.* The court goes on to explain that a plan administrator abuses its discretion when it ignores relevant evidence. *Id.* at 7. A plan administrator is required to evaluate the available evidence in its entirety before reaching a determination. *Id.* at 702.

The Court finds that AIG did not abuse its discretion by relying on Dr. Wimbish's report because Dr. Wimbish's conclusion that Plaintiff is not disabled as a result of zinc toxicity follows logically from the medical records in the Administrative Record. While the Court notes there are two small inaccuracies in Dr. Wimbish's report, neither are of enough significance to persuade the Court that Dr. Wimbish's report does not follow logically from Plaintiff's medical records.[10] Dr. Wimbish, in his first paragraph, states the medical records and other reviewing physician reports he reviewed. He then goes on to discuss Plaintiff's medical history. Dr. Wimbish then concludes that it is within all reasonable scientific probability that Plaintiff's exposure to zinc did not result in any of the signs and symptoms reported by her treating physicians and zinc toxicity has not occurred. The Court recognizes that this conclusion directly contradicts Dr. Bowman's diagnosis. However, as noted above, AIG is not required to give Dr. Bowman's diagnosis deference over a reviewing physician's opinion. *McGee,* 360 F.3d at 925. Therefore, as long as Dr. Wimbish's opinion follows logically

---

[10] Dr. Wimbish stated that Plaintiff did not suffer any of the signs and symptoms of zinc toxicity, except for fatigue and nausea. However, it is noted in Plaintiff's medical records that she did report vomiting on August 23, 2003, at her emergency room visit and diarrhea on August 25, 2003 in a visit to Dr. Bowman both of which, according to Dr. Wimbish, are symptoms of zinc toxicity. Additionally, Dr. Wimbish incorrectly reports Plaintiff's zinc levels on August 14, 2003 to be 202 mg/dl, but the accurate level was 208.5 mg/dl. Either number is above the normal range for zinc levels.

from Plaintiff's medical records, AIG was reasonable in relying on it. *Willcox,* 552 F.3d at 701.

The Court, in its review of the Administrative Record, has found that Dr. Bowman diagnosed Plaintiff with zinc toxicity consistently at every visit from August 25, 2003 until March 1, 2004. On January 12, 2004, Dr. Bowman noted he would talk to Plaintiff about seeing a toxicologist pending the neurological findings of Dr. Malik.[11] Dr. Malik diagnosed Plaintiff with myasthenia gravis, and Dr. Bowman never referred Plaintiff to a toxicologist. Myasthenia gravis is an autoimmune disease with the most common symptoms being drooping eyelids, double vision, and muscle fatigability after exercise. Slurred speech, difficulty swallowing, and proximal limb weakness are also common.[12] Plaintiff's medical records indicate that she suffers from all of these symptoms, and that Dr. Bowman and Dr. Malik began primarily focusing on the myasthenia gravis, along with Plaintiff's back problems from February 2004 until August 2004 when the medical records available stop. What is particularly noteable to the Court is that by March 29, 2004, Dr. Bowman had stopped noting zinc toxicity in his assessments of Plaintiff.[13]

In addition, the Court notes that Plaintiff's zinc levels decreased from August 2003 on her first lab test to December 2003 on her last lab test.[14] It is evident from the Administrative Record that

---

[11] Dr. Malik is the neurologists Dr. Bowman referred Plaintiff to see and who diagnosed her with masthenia gravis.

[12] The Merck Manual of Diagnosis and Therapy § 14 at 1497-1498 (Mark H. Beers and Robert Berkow ed., Merck Research Laboratories 17th ed. 1999) (1899).

[13] While the Court acknowledges that Dr. Bowman listed zinc toxicity as a condition suffered by Plaintiff on a physician questionnaire he filled our for AIG (AIGB-00549), Dr. Bowman saw Plaintiff six times through August 2004 without making any mention of zinc toxicity on Plaintiff's medical records.

[14] The parties rely on different measurements of zinc levels from Plaintiff's lab results to support their respective arguments and neither party offers the Court an explanation of the

none of Plaintiff's treating physicians tested her zinc levels after December 2003 even though the medical records available in the Administrative record extend into August 2004. After reviewing the Administrative Record, the Court finds it logical that Dr. Wimbish would conclude that Plaintiff does not suffers from zinc toxicity because her own treating physicians stopped diagnosing her with it. Additionally, Dr. Bowman stopped testing Plaintiff's zinc levels, and did not refer Plaintiff to the toxicologist as he noted he would do if her zinc levels were not resolved. It seems obvious to the Court that Plaintiff's treating physicians were no longer concerned with Plaintiff's zinc levels.

Dr. Wimbish also relies on his observation that Plaintiff was never treated for zinc toxicity with chelation therapy. The Court cannot find any instances in Plaintiff's medical records or expert reports indicating that she received any treatment for zinc toxicity other than lab tests and being removed from work until the source of the zinc could be determined. Therefore, the Court finds that it was logical for Dr. Wimbish to conclude that Plaintiff was not treated for zinc toxicity.

It is the opinion of the Court that Dr. Wimbish's report follows logically from Plaintiff's medical records. Dr. Wimbish obviously disagreed with Dr. Bowman, but for what seems to this Court as logical reasoning. Dr. Bowman discontinued screening Plaintiff for zinc in December 2003 and then stopped noting zinc toxicity on Plaintiff's medical records. Lastly, it seems Plaintiff was never treated for zinc toxicity. The Court finds that Dr. Wimbish's conclusion that Plaintiff does not suffer from zinc toxicity follows logically from the underlying medical evidence as required by the Eighth Circuit. *Willcox*, 552 F.3d at 701. For these reasons, the Court holds that AIG was reasonable

---

differences in the measurements. Plaintiff relies on the "ug/day" results which remained above the normal range in December 2003 but significantly decreased from Plaintiff's first lab results in August 2003. AIG, on the other hand, relies on the "ug/dl" measurement which is well within the normal range in December 2003.

in relying on Dr. Wimbish's report and did not abuse its discretion.

Finally, Plaintiff asserts that AIG should have relied on Dr. Marable's report rather than Dr. Wimbish's report. Plaintiff sent Dr. Marable's report to AIG during her appeal. Dr. Marable is a neurologist who examined Plaintiff. The Court is unclear as to whether Dr. Marable reviewed Plaintiff's medical records as he did not include them in the list of things he based his decision on and there are factually inaccurate statements in his report regarding Plaintiff's medical history. It is Dr. Marable's opinion that Plaintiff suffers from "zinc poisoning secondary to Poligrip denture adhesive" cream.[15]  Dr. Marable bases his conclusion on: 1) Dr. Rod O'Connor's report; 2) the fact that there was no zinc exposure at Plaintiff's work or in her drinking water; and 3) the "findings of the US Social Security Administration [granting] [Plaintiff] social security disability due to the documented decline in her health as a result of zinc poisoning."[16]  In *Rutledge*, the Eighth Circuit held that a plan administrator is not required to accept one doctor's opinion over that of the plaintiff's treating physician or other reviewing physicians. *Rutledge v. Liberty Life Assur. Co. of Boston,* 481 F.3d 655, 660 (8th Cir. 2007). "Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled." *Id.* (quoting *Delta Family-Care Disability and Survivorship Plan v. Marshall,* 258 F.3d 834, 843 (8th Cir. 2001)).

First, there is nothing in the record showing that Plaintiff was found to be disabled by the Social Security Administration as a result of zinc toxicity. Instead, the only evidence in the record is that Plaintiff was approved for social security benefits. Even if there was evidence that Plaintiff

---

[15] AIGB-00203

[16] AIGB-00203

was found disabled by the Social Security Administration based on zinc toxicity, AIG is not bound

by the determinations of the Social Security Administration. Instead, AIG must determine if Plaintiff

is permanently and totally disabled under the terms of the Accident Plan. Therefore, the Court finds

that it was reasonable for AIG to find that Dr. Marable's reliance on Plaintiff's social security benefit

approval was misplaced. Additionally, Dr. Marable's reliance on Dr. O'Connor's report also creates

pause for the Court. Dr. O'Connor's report states that Poligrip denture adhesive caused Plaintiff's

zinc toxicity. However, Dr. O'Connor based this conclusion on only one of Plaintiff's lab results

which showed elevated levels of zinc. This is the only piece of Plaintiff's medical records that Dr.

O'Connor considered in forming his opinion. For these reasons, the Court finds that it was

reasonable for AIG to rely on Dr. Wimbih's report rather than Dr. Marable's report.

After a reconsideration of the Court's original Memorandum Opinion (Doc. 33) and the

Administrative Record, the Court holds that a reasonable person could have determined that

Plaintiff did not suffer a PTD as a result of an injury which commenced within 365 days of an

accident as required by the Accident Plan. The Court comes to this conclusion by applying the

combination-of-factors method applied in *Glenn.* 128 S.Ct. at 2351. The Administrative Record

reflects that AIG did have a conflict of interest as it was both the claim administrator and the

insurer, and also AIG did not follow its own procedures when it allowed the same claim

specialist to review Plaintiff's appeal that had reviewed her initial claim. However, there are

many other factors that support the finding that AIG did not allow its conflict of interest to cause

it to abuse its discretion. These factors include: 1) AIG's request for additional information from

Plaintiff regarding her appeal; 2) AIG's explanation of information it relied upon in its denial

letter; and 3) AIG's actions of hiring a reviewing physician that reviewed all of Plaintiff's

medical records. After considering all of the factors, the Court finds that AIG has offered the Court "a reasonable explanation for its decision, supported by substantial evidence" and therefore the Court will not disturb AIG's denial. *Ratliff v. Jefferson Pilot Fin. Ins. Co.,* 489 F.3d 343, 348 (8th cir. 2007). Therefore, AIG did not abuse its discretion in denying Plaintiff's appeal based on its conclusion that Plaintiff's zinc toxicity was not a PTD resulting from an injury commencing within 365 days of an accident.

<u>CONCLUSION</u>

For the reasons stated above, the Court finds through this reconsideration that its original Order (Doc. 34), while applying the wrong approach to the abuse of discretion standard review, did produce the correct outcome. AIG did not abuse its discretion in denying Plaintiff's appeal for PTD benefits under the Accident Plan. Therefore, Plaintiff's claims against AIG Life Insurance Company and The Dow Chemical Company remain dismissed  with prejudice.  An order of even date, consistent with this opinion, shall issue.

IT IS SO ORDERED, on this 9th day of April, 2009.

      /s/ Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge